UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LARTASHA KELLY,<br>    Plaintiff<br>    v.<br>ANTHONY GATON, *et al.*,<br>    Defendants. | Civil Action No. 19-23 (CKK) |

**MEMORANDUM OPINION**
(November 15, 2021)

Plaintiff Lartasha Kelly brings this lawsuit against the District of Columbia and Metropolitan Police Department ("MPD") Officer Anthony Gaton based on the events leading to her arrest on June 29, 2018. After seeing Plaintiff strike another woman in the face twice, Officer Gaton tackled her to the ground. Plaintiff claims that Officer Gaton used excessive force and committed a battery in the course of arresting her. Defendants argue that Officer Gaton's use of force was reasonable under the circumstances and that he is entitled to qualified immunity.

Pending before the Court is Defendants' [39] Motion for Summary Judgment as to Plaintiff's remaining claims for excessive use of force in violation of the Fourth Amendment under 42 U.S.C. § 1983 and battery under District of Columbia common law. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court shall **GRANT** Defendants' Motion for Summary Judgment and dismiss this case.

---

[1] The Court's consideration has focused on the following documents:
- Memorandum of Points & Authorities in Support of Defendants Motion for Summary Judgment ("Defs.' Mot."), ECF No. 39;
- Memorandum of Points & Authorities in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"), ECF No. 41; and
- Defendants' Reply in Support of Motion for Summary Judgment ("Defs.' Reply"), ECF No. 42.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

## I. BACKGROUND

The Court will present the background of this case in two parts. First, the Court will provide the undisputed factual background for Plaintiff's claims, which will include those facts that are undisputed or unrefuted by the parties. After setting forth the undisputed factual background, the Court will outline those central facts which remain in dispute. Where possible, the Court notes facts that are clearly established by the body-worn camera ("BWC") video evidence in the record.[2] *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (directing courts to "view the facts in the light depicted by the videotape"). The Court notes at the outset, however, that the BWC videos in this case do not provide much clarity to the events described in the Complaint and the parties' pleadings; the videos were recorded at night, and either at a distance from the confrontation at issue or while the police officers were running towards it.

**A. Background Supported by Undisputed or Uncontroverted Facts in the Record**

On June 29, 2018, at approximately 12:07 a.m., MPD Officers Anthony Gaton and Stephen Naticchione responded to a domestic disturbance in the 3900 block of R Street SE in Washington, D.C. Defs.' Stmt. of Material Facts as to Which There is No Genuine Dispute ("Defs.' Stmt.") ¶¶ 1, 2, ECF No. 39-1.[3] Upon arriving, the officers observed a fire truck parked in the street and a group of approximately six people on the stoop in front of a two-story apartment building located

---

[2] The parties provided the pertinent BWC videos to the Court by email on December 4, 2020. *See* Defs.' Mot. Ex. 3, Notice Regarding Submission of BWC Footage to Chambers, ECF No. 39-4.

[3] In its Scheduling and Procedures Order, ECF No. [38], the Court directed that a "party responding to a statement of material facts must respond to each paragraph with a correspondingly numbered paragraph, indicating whether that paragraph is admitted or denied." Plaintiff did not do so, but instead copied certain (but not all) paragraphs from Defendants' Statement of Undisputed Facts and responded to them. In so doing, Plaintiff misnumbered the paragraphs copied from Defendants' Statement of Undisputed Material Facts. To the extent Plaintiff did *not* respond to certain paragraphs provided by Defendants, the Court treats those facts as admitted, in accordance with LCvR 7(h). To the extent Plaintiff has responded to facts provided by Defendants, but misnumbered the paragraphs, the Court has considered the content of those responses compared to the correct paragraphs of Defendants' Statement of Undisputed Material Facts.

at 3915 R Street SE. *Id.* ¶ 2; Pl.'s Opp'n Ex. 4, Deposition of Stephen Naticchione ("Naticchione Dep.") 10:2–11, ECF No. 41-4.  The MPD officers parked their vehicle in front of an apartment building approximately two buildings away from the building in front of which the group was gathered.  *See* Gaton BWC 04:25:27–37.[4]  As the MPD officers walked towards the group of people, they heard Plaintiff scream, "Wait 'til the fire department leave," "I'm gonna smack the fucking shit out of you, bitch" and "I promise you I am, I promise you I am."  Defs.' Stmt. ¶¶ 4–6; Naticchione BWC 04:25:31–42; Gaton BWC 04:25:31–43.  Plaintiff's threats can be clearly heard on the audio of the BWC video, even though the officers were walking from the street in front of a neighboring property.  Naticchione BWC 04:25:31–42; Gaton BWC 04:25:31–43.

As the officers approached the group of people, they observed Plaintiff strike another woman, Kionna Sims, in the face twice in rapid succession.  Defs.' Stmt. ¶ 6; Pl.'s Stmt. of Material Facts Proffered by Def. Which Are in Dispute ("Pl's Resp. Stmt.") ¶ 2, ECF No. 41.[5]  Plaintiff then shouted, "Now what?! Now what?! I'm gonna beat the shit out of you, bitch!"  Defs.' Stmt. ¶ 12; Pl.'s Resp. Stmt. ¶ 8.  As described in the next section, the nature and force of the strikes is disputed.

Upon seeing Plaintiff strike Ms. Sims, both officers ran towards the two women.  Naticchione BWC 04:25:45–49; Gaton BWC 04:25:43–47.  Simultaneously, a man wearing a white tank top (later identified as Mr. Sims' boyfriend, Mr. Davis, *see* Pl.'s Ex. 6, Declaration of Latarsha Kelly ("Pl.'s Decl.") ¶ 2, ECF No. 41-6) stepped between the two women to block Ms. Sims from Plaintiff.  *See* Naticchione BWC 04:25:45; Pl.'s Stmt. of Material Facts Not in Dispute

---

[4] The BWC timestamps cited in this Memorandum Opinion refer to the times indicated in the upper right-hand corner of the BWC videos.

[5] Plaintiff's Statement of Material Facts Proffered by Defendants Which are in Dispute begins on page 12 of the combined PDF filed at ECF No. 41.

3

("Pl.'s Stmt.") ¶ 29, ECF No. 41[6]; Defs.' Resp. to Pl.'s Stmt. of Material Facts Not in Dispute ("Defs.' Resp. Stmt.") ¶ 29 (not disputing that "[i]mmediately before the takedown, an African American male in a white tank top . . . is seen standing between [Plaintiff] and Ms. Sims.").

Without issuing any verbal command or warning, Defs.' Stmt. ¶ 16, Officer Gaton ran towards Plaintiff and "took [Plaintiff] to the ground and fell on top of her." Pl.'s Stmt. ¶ 20; Defs.' Resp. Stmt. ¶ 20; Naticchione BWC 04:25:47–50. Both officers could see that Plaintiff did not have any weapon. Pl.'s Stmt. ¶ 12 (citing Pl.'s Ex. 3, Deposition of Anthony Gaton ("Gaton Dep.") 18:9–12, ECF No. 41-3); id. ¶ 15 (citing Naticchione Dep. 19:7–9); Defs.' Resp. Stmt. ¶¶ 12, 15. Plaintiff did not attempt to hit Officer Gaton. Pl.'s Stmt. ¶ 24; Gaton Dep. 44:14–16.

Officer Gaton's "takedown" can be clearly seen in Officer Naticchione's BWC video: Officer Gaton wrapped his arms around Plaintiff and tackled her to the grass, in a "football-style" tackle. See Naticchione BWC 04:25:47–50; Gaton Dep. 27:1–15 (describing contact as "solo tackle takedown"); Naticchione Dep. 11:19–12:16 (testifying that Officer Gaton "tackled" Plaintiff "while he was running"). Approximately three seconds separate the time at which the officers saw Plaintiff strike Ms. Sims in the face and the time at which Officer Gaton tackled Plaintiff. Nattichone BWC 04:25:45–48; Gaton BWC 04:25:44–47. Officer Gaton stayed on top of Plaintiff and directed her to put her hands behind her back. Naticchione BWC 04:25:56–57. Plaintiff was taken to a hospital by ambulance, and diagnosed with a fractured hip. Defs.' Resp. Stmt. ¶ 36.

At the time of this incident, Plaintiff weighed approximately 115 to 120 pounds. See Pl.'s Stmt. ¶ 9; Defs.' Resp. Stmt. ¶ 9. Officer Gaton weighed approximately 265 pounds. Pl.'s Stmt. ¶ 10; Defs.' Resp. ¶ 10. Officer Gaton had been serving as an MPD officer for approximately three months. Gaton Dep. 46:13–19.

---

[6] Although Plaintiff did not file a cross-motion for summary judgment, she submitted a Statement of Material Facts Not in Dispute, which begins on page 3 of the PDF filed at ECF No. 41.

## B. Facts Remaining in Dispute

The parties dispute a number of facts pertaining to Plaintiff's actions and the MPD officers' observations. The Court recounts the facts remaining in dispute here.

First, the parties dispute the nature and force of Plaintiff's strikes on Ms. Sims' face. Defendants indicate that Officer Gaton observed Plaintiff "punch" Ms. Sims in the face twice. *See* Defs.' Stmt. ¶¶ 6, 8; *see also* Defs.' Ex. 1, Report of Investigation (Jan. 10, 2019) ("IAD Report"),[7] ECF No. 39-2. During his deposition Officer Gaton agreed that he saw two "blows" in "rapid succession to one another." Gaton Dep. 18:17–22. Officer Naticchione also testified that he saw Plaintiff "strike another individual in the face, twice." Naticchione Dep. 14:20–15:2. Both officers testified that Plaintiff's fist was clenched as her blows landed on Ms. Sims' face. *See* Naticchione Dep. 16:14–17:3; Gaton Dep. 14:22–15:2.

Plaintiff disputes that she "punched" Ms. Sims, and testified that she "smack[ed] and then "tap[ped]" her face. Pl.'s Resp. Stmt. ¶ 1; Pl.'s Ex. 1, Deposition of Latarsha Kelly ("Pl.'s Dep.") 55:9–16, ECF No. 41-1. She also stated that she had recently injured her right hand, preventing her from making a fist at the time of her confrontation with Ms. Sims. Pl.'s Stmt. ¶ 3.[8] The BWC videos do not provides a clear view of the confrontation between Plaintiff and Ms. Sims. But

---

[7] The IAD Report indicates that Officer Gaton "provided an audio recorded statement" to MPD's Internal Affairs Division on January 10, 2019. *See* IAD Report. The IAD report appears to summarize the statement. It is unclear from the report when the "audio recorded statement" was taken. Officer Gaton testified during his deposition that he made the statement described in the IAD report on the night of his encounter with Plaintiff. *See* Gaton Dep. 43:10–44:3.

[8] Defendants attempt to refute this point by providing a video of Plaintiff taken from the hospital where she was brought after the incident, in which she makes a fist with her *left* hand. *See* Defs.' Resp. Stmt. ¶ 3; 20180629-313-GW_HOSPITAL 3.00 to 3.13. There is contradictory testimony on the record about which hand Plaintiff used to strike Ms. Sims. *See, e.g.,* IAD Report ("Officer Gaton advised that Ms. Kelly became extremely enraged and then punched Ms. Sims on the right side of her face two times with her left fist."); *see also* Gaton Dep. at 14:18–15:9 (describing Plaintiff using her "right hand" to strike Ms. Sims on the "left side" of her face).

5

regardless of whether Plaintiff "punched" or "smacked" Ms. Sims, it is clear from the record that Plaintiff assaulted her by striking her on the face twice.

Next, the parties dispute Plaintiff's conduct immediately after she struck Ms. Sims, but before she was tackled by Officer Gaton. Officer Gaton testified that Plaintiff appeared to be "combative" and "still had her hands up like she was still ready to fight." Gaton Dep. 33:21–22. Officer Naticchone agreed that after Plaintiff struck Ms. Sims' face, she "still had her hands up in a fighting pose." Naticchione Dep. 21:14–16. Moreover, in a video of Plaintiff taken from the hospital after the incident, Plaintiff stated that she "wasn't running" from the police before Officer Gaton tackled her, but that she "still had my guards up." 20180629-313-GW_HOSPITAL 3.00 to 3.13.[9] Despite this statement on the same night as the incident, Plaintiff now indicates that "prior to the takedown," her right hand was lowered. Pl.'s Stmt. ¶ 26. Although it is not possible to verify either party's account from the BWC video, it is clear that Plaintiff had not disengaged from her encounter with Ms. Sims; she continued to yell (which she does not dispute) and the two women remained in close proximity to each other as Officer Gaton ran towards them and tackled Plaintiff. Naticchione BWC 04:25:46.

The parties also dispute Plaintiff's reaction to seeing the police officers approaching, and whether her actions conveyed any intent to run away from the scene. Plaintiff testified that she did not know that the police were present until after she was tackled by Officer Gaton. Pl.'s Dep. 55:9–16. Officer Gaton testified that he saw Plaintiff "turn[ ]" towards him and Officer Naticchione as they were approaching, and "kind of turned her body back this way" which made him "assume[ ] she was trying to run away" from the officers. Gaton Dep. 37:15–38:1. Defendants indicate that Plaintiff "took one to two steps backwards," Defs.' Stmt. ¶ 9; see IAD Report

---

[9] This video was submitted by Defendants with the BWC videos. See supra note 2.

("Officer Gaton stated that Ms. Kelly then turned her body towards the approaching offices and took a step backwards away from him."). However, Officer Gaton testified in his deposition that he did not see Plaintiff take any steps away from him, but that she "just turned her head, basically" and from that, he inferred she was trying to run "because of her body movement." Gaton Dep. 38:1–4; 45:13-15 (confirming that "all [Plaintiff] did, with respect to you, is to turn her head"); *see also* Pl.'s Stmt. ¶ 27; Defs.' Resp. Stmt. ¶ 27. Again, the BWC provides little clarity to either party's account. It is not possible to see how, if at all, Plaintiff's body turned away from the officers. However, it is clear Plaintiff did not leave the scene, or take more than, at most, a few steps away from Ms. Sims or the MPD officers.

Finally, Plaintiff claims that at the time Officer Gaton tackled her, Ms. Sims was "being held back from retaliating." Pl.'s Stmt. ¶ 5. Plaintiff indicates that she and Ms. Sims had "already been separated by a man wearing a white tank top," citing to the BWC in support of this assertion. Although Defendants do not appear to dispute that Mr. Davis has stepped between the two women, and may have restrained Ms. Sims, they do not concede that this terminated the confrontation. *See, e.g.*, Defs.' Stmt. ¶¶ 12–14; Defs.' Resp. Stmt. ¶ 17 (Plaintiff was "taking a fighting stance and threatening [Ms.] Sims when Officers Gaton used a tactical takedown of Plaintiff to end the conflict.").

## II.  LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The mere existence of some factual dispute is insufficient on its own to bar summary judgment; the dispute must pertain to a "material" fact. *Id.* Accordingly, "[o]nly disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Nor may summary judgment be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. *Id.*

In order to establish that a fact is or cannot be genuinely disputed, a party must (a) cite to specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of his or her position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute sufficient to survive summary judgment. *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009). Moreover, where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the district court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

When faced with a motion for summary judgment, the district court may not make credibility determinations or weigh the evidence; instead, the evidence must be analyzed in the light most favorable to the non-movant, with "all justifiable inferences drawn in [her] favor." *Liberty Lobby*, 477 U.S. at 255. If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, summary judgment is inappropriate. *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). In the end, the district court's task is to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty*

*Lobby*, 477 U.S. at 251–52.  In this regard, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50 (internal citations omitted).

### B. Qualified Immunity

Where, as here, a plaintiff brings a claim under 42 U.S.C. § 1983, the defendant may raise a defense of qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The Supreme Court has established a two-prong analysis for resolving qualified immunity claims.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001).  The first prong requires the Court to decide whether the facts the plaintiff has shown make out a violation of a constitutional right.  *See id.* at 201.  The second prong requires the Court to consider whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.*  "Whether a § 1983 defendant's conduct violates the 'clearly established' constitutional rights of the plaintiff is a pure question of law that must be resolved by the [C]ourt." *Pitt v. Dist. of Columbia*, 491 F.3d 494, 509 (D.C. Cir. 2007). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently

clear that every reasonable official would understand that what he is doing is unlawful." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal citation and quotation marks omitted). "In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate." *Id.* (internal citation and quotation marks omitted). The Court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"A defendant must first raise the defense of qualified immunity when facing a § 1983 claim, but once asserted, the burden of proof falls to the plaintiff to show that the official is not entitled to qualified immunity." *Campbell v. Dist. of Columbia*, 245 F. Supp. 3d 78, 85 (D.D.C. 2017) (internal citation and quotation marks omitted). At the summary judgment phase, the plaintiff must offer sufficient evidence to create a "genuine issue of fact," that is, "evidence on which [a] jury could reasonably find for the plaintiff." *Liberty Lobby, Inc.*, 477 U.S. at 252. Where, as here, "the question of qualified immunity is presented on summary judgment and where the parties' versions of events differ, the Court must 'view the facts and draw reasonable inferences in the light most favorable to the party opposing' the motion." *Cutchin v. Dist. of Columbia*, 369 F. Supp. 3d 108, 119 (D.D.C. 2019) (quoting *Scott*, 550 U.S. at 378).

### III. DISCUSSION

#### A. Excessive Use of Force

Defendants first argue that they are entitled to summary judgment on Plaintiff's claim under 42 U.S.C. § 1983 that Officer Gaton used excessive force in arresting her, violating her rights under the Fourth Amendment. *See* Defs.' Mot. at 4. Defendants argue that this claim fails

as a matter of law because (1) Officer Gaton's conduct was objectively reasonable; and (2) even if it was not, he is entitled to qualified immunity. *Id.* at 4–10.

As set forth below, applying the two-prong test for qualified immunity articulated by the Supreme Court, the Court concludes that Officer Gaton is entitled to qualified immunity, and so shall grant summary judgment to Defendants as to Plaintiff's § 1983 claim.

   1. Constitutional Violation

Consistent with the Fourth Amendment, a police officer may use a "reasonable" amount of force to effect an arrest. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Cooper v. Dist. of Columbia*, --- F. Supp. 3d ---, 2021 WL 2894644, at *6 (D.D.C. July 9, 2021) ("The reality of placing someone under arrest . . . often necessitates the use of force."). However, "[l]aw-enforcement officers run afoul of the Fourth Amendment when they use more force than is objectively reasonable to arrest a suspect." *Cooper*, 2021 WL 2894644, at *4 (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985); *Robinson v. Dist. of Columbia*, 130 F. Supp. 3d 180, 193 (D.D.C. 2015)).

To evaluate claims of excessive force, courts consider whether the officer's use of force was objectively reasonable under the circumstances. *See Cnty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1546–47 (2017). "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. Accordingly, the Court judges the reasonableness of the force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Although the Court "evaluate[s] the reasonableness of the officers' actions by viewing the events from their perspective," it "consider[s] the facts in the record and all

reasonable inferences derived therefrom in the light most favorable to [the plaintiff]." *Scott v. Dist. of Columbia*, 101 F.3d 748, 759 (D.C. Cir. 1996). The Supreme Court has laid out three factors to consider in assessing the reasonableness of an officer's use of force: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The Court may also consider the severity of the plaintiff's injury. *See Wardlaw v. Pickett*, 1 F.3d 1297, 1304 n.7 (D.C. Cir. 1993)

The first *Graham* factor, the severity of the suspected crime, weighs in favor of Defendants. It is undisputed that Plaintiff had committed an assault and battery against Ms. Sims—regardless of whether she "punched," "smacked" or "tapped" her. Plaintiff does not dispute that she yelled threats at Ms. Sims, nor does she dispute that she struck her in the face twice. Although the BWC footage does not provide a clear view of the nature of Plaintiff's strikes on Ms. Sims, it is apparent from the video that the strikes required another person to step in between the two women to separate them, and prompted the MPD officers to start running towards the gathering of people. Plaintiff, however, argues that her actions did not amount to a "severe" crime because she did not have any weapon and because Ms. Sims was "not seriously hurt"—both MPD officers testified that they did not see any blood on Ms. Sims' face, and that they did not hear her scream in pain in reaction to being hit. Pl.'s Mem. at 21, 23 (characterizing Plaintiff's actions as a "very minor assault"). Even if Ms. Sims did not suffer serious injuries, Officer Gaton clearly saw Plaintiff commit an assault against her, and reacted quickly (within seconds) to prevent any further acts of aggression.

The second *Graham* factor—whether the suspect poses an immediate threat to the safety of the officers or others—is a closer call, but tips in Defendants' favor. The MPD officers did not

12

appear to view Plaintiff as an immediate threat to their own safety; Officer Gaton testified, for example, that Plaintiff did not try to hit him.  Gaton Dep. 32:1–2.  Defendants present stronger evidence that Plaintiff posed an ongoing threat to Ms. Sims, offering testimony that Plaintiff remained "combative" after striking Ms. Sims in the face twice.  Plaintiff admitted in a video taken on the same night of the incident, that she "had her guards up." *See supra* Section I(B).  Moreover, Plaintiff does not dispute that even after she hit Ms. Sims, she yelled at her "Now what?! I'm going to beat the shit out of you, bitch!"  Defs.' Stmt. ¶ 12; Pl.'s Resp. Stmt. ¶ 8 (denying only that she "maintained a fighting stance," but not that she yelled this threat to Ms. Sims).  Plaintiff, however claims that by the time Officer Gaton was close enough to tackle her, she had already stepped back from Ms. Sims, had dropped her hands, and was already being separated from Ms. Sims by Mr. Davis.  *See* Pl.'s Opp'n at 22; Pl.'s Resp. Stmt. ¶ 8; Pl.'s Ex. 13, Expert Report of Michael D. Lyman, PH.D (Jan. 20, 2020) at 12, ECF No. 41-13.  Although Mr. Davis had stepped between the two women, Plaintiff had plainly not terminated the confrontation in the seconds following her strikes against Ms. Sims.  She continued to yell, and admitted that she kept her "guards up."

As to the third *Graham* factor, the Court considers whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight.  This factor favors Plaintiff.  There is no evidence on the record that Plaintiff resisted arrest.  To the contrary, she testified that she did not even know that the officers had arrived until after she was tackled.  Moreover, there is no evidence that Plaintiff attempted to evade arrest by flight.  At most, according to Defendants, Plaintiff turned her head in a way that led Officer Gaton to assume that she *might* attempt to flee, and possibly took one or two steps back, away from the officers' direction.

As a final point, Plaintiff indicates that she suffered a serious injury from being tackled by Officer Gaton, whereas Ms. Sims was not seriously injured by Plaintiff's strikes.  Pl.'s Opp'n at

13

21. "Although the severity of [the plaintiff's] injuries is not by itself the basis for deciding whether the force used was excessive, it does provide some indication of the degree of force [the officer] used." *See Wardlaw*, 1 F.3d at 1304 n.7.

Based on its review of the *Graham* factors, whether Officer Gaton's tackle was objectively reasonable is a close call. But even considering Plaintiff's version of events, it is undisputed that Plaintiff struck Ms. Sims in the face twice and remained combative, even after the initial blows. Although someone had stepped between her and Ms. Sims as Officer Gaton ran towards them, Plaintiff had not terminated the encounter, and remained aggressive—yelling at Ms. Sims and, in her own words, Plaintiff kept her "guards up." Officer Gaton reacted quickly, within seconds, to subdue Plaintiff in response to what he witnessed. In light of these facts, the Court finds that Officer Gaton's actions did not amount to a constitutional violation based on an unreasonable use of force.

Even if the Court concluded that Officer Gaton's use of force was *not* objectively reasonable, he is entitled to qualified immunity so long as the use force did not violate "clearly established" law. *Pearson*, 555 U.S. at 231. For the reasons set forth in the next section, the Court concludes that Plaintiff has failed to satisfy her burden as to the second prong of the qualified immunity test articulated by the Supreme Court, and therefore summary judgment in Defendants' favor is warranted.

    2. <u>Clearly Established Law</u>

Even adopting Plaintiff's version of events, the Court concludes that Officer Gaton is entitled to qualified immunity because Plaintiff has not demonstrated that his use of force violated a "clearly established" right. *Campbell*, 245 F. Supp. 3d at 85 ("[T]he burden of proof falls to the plaintiff to show that the official is not entitled to qualified immunity."). A right is "clearly

14

established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal citation and quotation marks omitted); *see also Wesby*, 138 S. Ct. at 589 ("[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'" (internal citation omitted)). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). In other words, the Court must consider whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Saucier*, 533 U.S. at 202 (emphasis added). Although the plaintiff need not identify "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, at 137 S. Ct. at 551 (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted).

None of the cases relied upon by Plaintiff support her position that Officer Gaton violated a clearly established right by tackling Plaintiff after witnessing her yell threats, strike another woman in the face twice, and maintain an aggressive posture. Plaintiff offers several examples of "cases involving police takedowns where suspects claimed not to have resisted arrest," in which courts have denied summary judgment to the officer-defendants. *See* Pl.'s Opp'n at 22–23, 25. Plaintiff contends that these cases show that it is "clearly established" that a police officer may not execute a "takedown" when "there is no or minimal resistance or an attempt to flee." *Id.* at 25. But Plaintiff ignores key factual distinctions between this case and those upon which she relies. Plaintiff first cites *Smith v. City of Troy*, 874 F.3d 938 (6th Cir. 2017) and *Montoya v. City of Flaundreau*, 669 F.3d 867 (8th Cir. 2012), in which the courts concluded that summary judgment

in the officers' favor was inappropriate.  In *Smith,* the court reasoned that it could not conclude that the officer's "takedown" was reasonable because, in part, there was a factual dispute about whether the plaintiff resisted arrest.  *Smith*, 874 F.3d at 944–45.  In *Montoya*, the court concluded that summary judgment was inappropriate because the plaintiff had not resisted arrest.  Pl.'s Mem. at 23; *Montoya*, 669 F.3d at 871.  But both cases involved plaintiffs who had committed, at most, minor, non-violent crimes.  *Smith,* 874 F.3d at 945 (observing there "is little in the record to suggest that [plaintiff] committed any crime, even a minor one");  *Montoya*, 669 F.3d at 873 (noting that the plaintiff had committed a "non-violent" misdemeanor offense (disorderly conduct), and "was not threatening anyone").  In contrast, Plaintiff here assaulted her neighbor, a point she does not dispute, and did not disengage from the confrontation after striking Ms. Sims.[10]  Plaintiff also cites *Morris v. Noe*, 672 F.3d 1185 (10th Cir. 2012).  The facts from that case again differ in at least one substantial way—the court in *Morris* noted that the plaintiff plainly presented no threat to the officers *or to other people*.  *See Morris*, 672 F.3d at 1198.  Here, Officer Gaton reacted quickly after seeing Plaintiff strike another woman on the face twice and remain aggressive after doing so.

In sum, Plaintiff has failed to point to any cases which would have put a reasonable officer on notice that it was objectively unreasonable to tackle someone who had struck another person in the face twice while screaming threats and obscenities and maintaining an aggressive posture.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("[P]olice officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.") (quotation

---

[10] Plaintiff also cites *Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) for the proposition that the court should "allow[ ]" a claim of excessive force to "go to a jury" where the plaintiff "put up only minimal resistance" to arrest.  Pl.'s Opp'n at 23.  Although the Ninth Circuit in *Shafer* noted that a reasonable juror could conclude that the officer's "leg-sweep" maneuver was "excessive," it nonetheless concluded that the officer was entitled to qualified immunity because the plaintiff failed to identify any "sufficiently specific constitutional precedents to alert [the officer] that his particular conduct was unlawful."  *Shafer*, 868 F.3d at 1116, 1118.  Accordingly, Plaintiff's reliance on this case is also unavailing.

16

omitted). Accordingly, Officer Gaton retains his qualified immunity for tackling Plaintiff to the ground, and summary judgment shall be granted in Defendants' favor as to Plaintiff's excessive force claim.

### B. Battery

Defendants also seek summary judgment as to Plaintiff's battery claim under District of Columbia common law.[11] Defs.' Mot. at 10. Defendants again argue that Officer Gaton is shielded from liability based on a qualified privileged recognized under District of Columbia common law. *See id.* at 11. Defendants also contend that Plaintiff's claim against the District of Columbia under the theory of *respondeat superior* fails. Defs.' Reply at 9,

Under District of Columbia law, battery is "an intentional act that causes a harmful or offensive bodily contact." *Evans-Reid v. Dist. of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (internal citations omitted). A "police officer effecting an arrest commits a battery." *Jackson v. Dist. of Columbia*, 327 F. Supp. 3d 52, 68 (D.D.C. 2018) (quoting *Dist. of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003)). However, if the arresting officer "does not use force beyond that which the officer reasonably believes is necessary, he is clothed with privileged." *Id.* In other words, "[l]argely analogous to the qualified-immunity defense above, officers may invoke a 'qualified privilege' to tort liability." *Cooper*, 2021 WL 2894644, at *7 (citing *Williams v. Dist. of Columbia*, 268 F. Supp. 3d 178, 194 (D.D.C. 2007); *Chinn*, 839 A.2d at 705–06). "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Scales*

---

[11] The Court retains supplemental jurisdiction over Plaintiff's common law battery claim because it arises from a "common nucleus of operative fact" as her claim for excessive force under § 1983—specifically Officer Gaton's execution of a tackle in effecting her arrest. *Konah v. Dist. of Columbia*, 815 F. Supp. 2d 61, 78 (D.D.C. 2011) (citing *Women Prisoners of the D.C. Dep't of Corr. v. Dist. of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996)).

*v. Dist. of Columbia*, 973 A.2d 722, 730 (D.C. 2009) (quoting *Evans-Reid*. 930 A.2d at 937). "The officer's judgment is to be reviewed 'from the perspective of a reasonable officer on the scene,' with allowance for the officer's need to make quick decisions under potentially dangerous circumstances." *Id.* (quoting *Rogala v. Dist. of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (additional citation omitted)). "Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." *Evans-Reid*, 930 A.2d at 937 (internal citation omitted); *see also Jenkins v. Dist. of Columbia*, 223 A.3d 884, 900 (D.C. 2020) ("We have also said that [f]or assault and battery the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged." (internal quotation marks and citations omitted)). "[T]he test for qualified privilege in [a] . . . battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales*, 973 A.2d at 730. "The objective piece of the qualified privilege analysis is similar to the excessive force standard applied in the Section 1983 context." *Williams*, 268 F. Supp. 3d at 194 (internal citation and quotation marks omitted).

    Within this framework, the Court finds that Officer Gaton is entitled to a qualified privilege for tackling Plaintiff to the ground in the course of arresting her. *See Jenkins*, 223 A.3d at 900 ("[W]e can decide this case on the basis of privilege and therefore need not definitively decide whether the [officer's conduct] was lawful."). As to the subjective component of the qualified privilege analysis, Officer Gaton testified during his deposition that no other tactics would have been reasonable to subdue Plaintiff in light of the need for a quick decision and the presence of other people in close proximity. *See, e.g.*, Gaton Dep. 28:22–30:1; 31:9–34:7. Plaintiff does not

dispute that Officer Gaton subjectively believed that his use of force was reasonable. *See* Pl.'s Opp'n at 28–29. Nor has she offered any evidence suggesting that he acted in bad faith. *See Jenkins*, 223 A.3d at 903.

With respect to the objective component of the qualified privilege assessment, Plaintiff argues that Officer Gaton's tackle was not objectively reasonable. As with her § 1983 claim, Plaintiff contends that her assault of Ms. Sims was "not that serious" because Ms. Sims "did not scream" after being hit, there was no visible blood, and Plaintiff did not have a weapon. Pl.'s Opp'n at 28–29. She also argues that Officer Gaton's tackle was unreasonable because the two women had already been separated by Mr. Davis. *Id.* at 29. In Plaintiff's view, Officer Gaton "could have employed less violent means to arrest her," which would not have resulted in an injury. *Id.* at 29. Defendants respond that Officer Gaton's "takedown" of Plaintiff was reasonable because he had witnessed Plaintiff strike Ms. Sims twice, continued to verbally threaten her, and maintained an "aggressive fighting stance." Defs.' Reply at 9. These circumstances led Officer Gaton to conclude that Plaintiff "was continuing to attack" Ms. Sims. *Id.*; *see also Evans-Reid*, 930 A.2d at 937 ("[A]n officer[] is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm.").

The Court's analysis of the objective reasonableness of Officer Gaton's actions in the context of Plaintiff's § 1983 claims applies with equal force to her battery claim. *See supra* Section III(A)(1); *see Williams*, 268 F. Supp. 3d at 194; *Rogala*, 161 F.3d at 57. Upon review of the record evidence in this case, the Court concludes that Officer Gaton's conduct was "reasonably necessary" in light of the circumstances he confronted, namely Plaintiff's ongoing aggression towards Ms. Sims after striking her in the face twice. *Jenkins*, 223 A.3d at 900. Accordingly, Officer Gaton is entitled to a qualified privilege for the takedown maneuver he performed on

Plaintiff, defeating Plaintiff's battery claim.  Because "the defendant officer[ ] did not commit battery against the plaintiff, the District of Columbia cannot be liable under the doctrine of *respondeat superior*."  *Hargraves v. Dist. of Columbia*, 134 F. Supp. 3d 68, 93 (D.D.C. 2014).  Defendants, therefore, are entitled to summary judgment on Plaintiff's common law battery claim.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' [39] Motion for Summary Judgement as to Plaintiff's remaining claims for excessive use of force in violation of the Fourth Amendment under 42 U.S.C. § 1983 and battery under District of Columbia common law.  An appropriate Order accompanies this Memorandum Opinion.

>   /S/
> COLLEEN KOLLAR-KOTELLY
> United States District Judge

**Date**: November 15, 2021